AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE   EMJ 8.13.25

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

*FILED*
*AUG 14 2025*
JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| the black Apple iPhone 12 seized from Brandon Scott Massey on August 7, 2025 pursuant to the Search Warrant filed under MJ-25-456-ALM | ) ) ) |

Case No. MJ-25- 484-AUM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is attached and incorporated by reference herein.

located in the _____ Western _____ District of _____ Oklahoma _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, which is attached and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. s. 2251(a) & (e) | Attempted Production of Child Pornography |
| 18 U.S.C. s. 2252A(a)(1) | Transportation of Child Pornography |
| 18 U.S.C. s. 2252A(a)(5)(B) | Possession of Child Pornography |

The application is based on these facts:

See the attached Affidavit of FBI Special Agent Shana M. Terry, which is incoporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Shana M. Terry, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 8/14/25 _____

*Judge's signature*

City and state:  Oklahoma City, Oklahoma

AMANDA L. MAXFIELD, U.S. MAGISTRATE JUDGE
*Printed name and title*

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT</u>

I, Shana Marie Terry, a Special Agent with the Federal Bureau of Investigation ("FBI"), Oklahoma City, Oklahoma, being duly sworn, depose and state as follows:

1.      I have been employed as a Special Agent of the FBI since February 2019 and have been assigned to the Oklahoma City Division for the entirety of that time. I am currently assigned to the Norman Resident Agency. During my time as a Special Agent, I have conducted a wide variety of investigations, including numerous cases involving child pornography and sexual exploitation of children.

2.      As a Special Agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

3.      This Affidavit is submitted in support of an application, under Rule 41 of the Federal Rules of Criminal Procedure, for a warrant to search a cellular phone (hereinafter referred to as the "SUBJECT CELLPHONE"), which is described in detail in **Attachment A** to this Affidavit, for the items specified in **Attachment B** hereto, for contraband and evidence, fruits, and instrumentalities of violations of the offenses under investigation, of which items are more specifically described in **Attachment B** of this Affidavit.

4.      As set forth below, there is probable cause to believe that the **SUBJECT CELLPHONE** contains fruits, contraband and evidence, and instrumentalities of violations of 18 U.S.C. §§ 2251(a) and (e) (Attempted Sexual Exploitation of a Child), 18 U.S.C. § 2252A(a)(1) (Transportation of Child Pornography), and 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography).

5.      The information contained in this Affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers

and witnesses, and review of documents and records. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## JURISDICTION

6.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711 and 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States…that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## TERMS

7.   The following definitions apply to this Affidavit and Attachment B:

a.    "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where (1) the production of the visual depiction involves the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

b.    "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

c.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

d.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

e.      "Minor" as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

f.      "Computer," as used broadly herein, refers to "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones. *See* 18 U.S.C. § 1030(e)(1).

g.      "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers,

video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

      h.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

      i.      The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      j.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail remote storage, and co-location of computers and other communications equipment.

k.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a form that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and e-mail.

l.      "Short Message Service" ("SMS"), as used herein, is a service used to send text messages to mobile phones. SMS is also often referred to as texting, sending text messages, or text messaging.  The service allows for short text messages to be sent from one cell phone to another cell phone or from the Web to another cell phone.

m.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

## BACKGROUND ON FACEBOOK AND META PLATFORMS, INC.

8.      Meta Platforms, Inc. ("Meta") owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

9.      Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

10.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

11.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

12.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her

"Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

13.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

14.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, and video. Meta retains messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats.

15.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

16.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

### PROBABLE CAUSE

17.     This investigation originated on April 17, 2025, when C.W., the mother of K.K., a fifteen-year-old female, called the FBI National Threat Operations Center to report that an adult male named Brandon **MASSEY** was posing as a teenager on Facebook in an attempt to persuade K.K. to send him sexually explicit images of herself.

18.    MASSEY and K.K. belonged to a public Facebook group named "Christian teens [cross emoji]."[1]  As can be seen in screenshots taken by C.W., MASSEY regularly interacted with minor females in the group, including by commenting on images the minor females posted of themselves.  For example, MASSEY commented, "Beautiful" on one minor female's image, and "U have cute eyes" on a different minor female's image.  When MASSEY was asked his age, he replied "17."

19.    MASSEY's interaction with K.K. began on or around March 19, 2025, when K.K. posted an image of herself in the group chat, showing off the outfit she planned to wear to a dinner event.  MASSEY replied to K.K.'s post, "Hi" and "Dm me."  MASSEY added, "Says I can't reply to u."

20.    According to C.W., the most likely reason MASSEY was unable to send a direct message to K.K. was due to the account settings.  Facebook Messenger has a setting called "Message Delivery," which allows a user to control who can send messages.  C.W. set the settings on K.K.'s account so that it allowed only incoming messages from users with mutual friends.  K.K. asked MASSEY to try again, presumably after changing the setting.

21.    MASSEY was then able to communicate with K.K. in a Direct Message, and he began by telling her, "U looked really cute in that picture you sent in the gc[2] of ur outfit."  K.K. did not immediately respond, and, approximately two hours later, MASSEY tried to audio call her, but it went unanswered.  The following day, MASSEY asked K.K. to resend the image that she had posted in the group chat, and she did.  MASSEY asked, "Can I make u something with that,"

---

[1] Emojis are a standardized set of characters used to convey ideas and messages in electronic communication.  They serve as a visual representation of human emotions, living being, objects, and even certain symbols.

[2] Based on my training and experience, the abbreviation "gc" used in this context is shorthand for "group chat."

and K.K. responded that she did not mind.  **MASSEY** sent the image back to her with several lines of text surrounding the image of her, including, "This is an absolutely beautiful angel," and "Your just so beautiful and I'm glad I got to make your day and make this for you."

22.    During their conversation, **MASSEY** asked for additional pictures of K.K. and asked about her life, including whether she had a boyfriend and whether they were "active." K.K. revealed that she was "an abstinent person."  **MASSEY** was supportive and listened to K.K.'s problems, advising her "I'll listen anytime u need to talk."

23.    At least twice during their conversation, K.K. advised that she was fifteen years old. When K.K. asked for **MASSEY**'s age, he replied he was seventeen years old. **MASSEY** sent K.K. a picture of himself, which appeared to be a teenage male who was wearing a football uniform. Other young males could be seen in the background.

24.    One of the pictures K.K. sent to **MASSEY** showed her in a sweatshirt that was cropped above her breasts.  K.K. was also wearing a bra so that her breasts were not exposed. **MASSEY** asked, "Where's the rest of the hoodie," and K.K. responded, "It's made like that :)." **MASSEY** said, "I'd rather see u wearing that as a regular top by itself with nothing else lol." K.K. laughed off **MASSEY**'s comment, and **MASSEY** asked, "What's funny," indicating his statement was not a joke.  K.K. ultimately ignored **MASSEY**'s request and did not send another picture. **MASSEY** then asked, "Can I see ur outfit right now," and K.K. responded with a picture of herself sitting cross-legged on a bed and wearing a tee shirt and shorts, resting her hands in her lap. **MASSEY** asked, "What's ur shorts look like." When K.K. did not respond for approximately 25 minutes, **MASSEY** sent a follow up message, "??" After approximately ten more minutes, K.K. apologized, "So sorry one sec!" After approximately 35 minutes, **MASSEY** said, "I'm waiting." K.K. sent a picture of herself standing so that her shorts were clearly visible.  **MASSEY** replied to

the image, "So gorgeous." **MASSEY** followed up by saying, "I'd rather see them from the back pulled just below your butt." K.K. again laughed it off and asked **MASSEY**, "Are you good lol?" **MASSEY** said, "Ya. Just wish they was pulled down to show what color ur wearing under them." K.K. ignored the request. The interaction between **MASSEY** and K.K. spanned approximately 11 days.

      25.    C.W. found the messages between K.K. and **MASSEY** during a routine check of K.K.'s phone. The messages had been moved to the Archived Chats folder.[3] C.W. immediately suspected that **MASSEY** was an adult based on the way he spoke to K.K., and C.W. reached out to **MASSEY** herself under the ruse of accidentally "adding" **MASSEY** as a friend. C.W. told **MASSEY** that she was 35 years old and asked for his age and a picture. **MASSEY** told C.W. he was 28 years old and sent a picture of himself in the bathroom mirror, which corroborated he was an adult.

      26.    The cover photo on **MASSEY**'s Facebook account depicted an adult male and what appeared to be a younger male on dirt bikes. The profile did not include any other identifiers. The adult male in the cover photo was consistent with the picture **MASSEY** sent of himself to C.W.

      27.    C.W. then sought to find out where **MASSEY** lived since he shared such limited information on his profile. C.W. reviewed **MASSEY**'s friend list and sent a direct message to A.F., an adult woman, and asked if she knew **MASSEY** in person. A.F. confirmed that she did, and she corroborated that **MASSEY** was an adult male whom she last knew to live in Chickasha,

---

[3] Archived messages on Facebook Messenger are conversations that a user has chosen to remove from the active inbox view without permanently deleting them. When a message thread is archived, it is moved to a separate "Archived Chats" folder but remains accessible to the user and can be restored to the main inbox at any time. Archived messages retain all original content, including text, media, timestamps, and participant information.

Oklahoma. A.F. confirmed that the adult male in the cover photo on **MASSEY**'s profile was an individual she knew to be **MASSEY**.

28.    A.F. also advised that the picture of the minor male in the football uniform that **MASSEY** had used to portray himself to K.K. was actually **MASSEY**'s younger brother.

29.    On April 29, 2025, I served a subpoena to Meta Platforms, Inc. for subscriber information associated with **MASSEY**'s Facebook account.  Responsive records indicate the account was created on 1/23/2023 and is registered under the name Brandon **MASSEY**.  Records also indicate that Facebook sent a CyberTipline Report to the National Center for Missing and Exploited Children ("NCMEC") in March of 2024 regarding apparent unauthorized activity on **MASSEY**'s account.

30.    On May 19, 2025, a copy of the CyberTipline report was obtained from NCMEC. The report names the user of the target account as Brandon **MASSEY**, along with a date of birth consistent with **MASSEY**'s true birth date.  The report details that, on 3/17/2024, the account uploaded an image categorized as depicting a sex act involving a prepubescent minor, to a Messenger thread named "Russian – Ukrainian war videos."  The file was unavailable to law enforcement without a search warrant. The CyberTipline Report included an image file containing the account's profile picture, which is consistent with the profile picture reported by C.W.

31.    The CyberTipline Report also included additional information reported by Facebook, "Activity on the platform indicates that the user is a minor, despite their listed age being an adult," which suggests that **MASSEY** was representing himself as a minor in the records reviewed by Facebook.

32.    A search of Oklahoma Department of Motor Vehicle records revealed a Driver's License for Brandon Scott **MASSEY**, date of birth 1/XX/1997. The Driver's License photo is

consistent with both the cover photo associated with **MASSEY**'s Facebook account and the picture **MASSEY** sent to C.W. Chickasha, Oklahoma is located in Grady County and is within the bounds of the Western District of Oklahoma.

33.     A Federal Search Warrant was served to Meta for the content of **MASSEY**'s Facebook account. Responsive records provided by Meta included the file reported to NCMEC. The file is a 60-second video depicting an adult woman performing oral sex on a nude male toddler's penis, and then guiding him to insert his penis into her vagina.

34.     The Facebook records included the Facebook groups of which **MASSEY** was a member, many of which are advertised as being for teens or minors only. Examples include: "13-14-15 years old Friends," "Jobs for 13 year olds," "11-14 Year Olds," "12 years old only," and "Single 13 years old."

35.     The chat messages on **MASSEY**'s Facebook account revealed that he relentlessly solicited sexually explicit images and videos from both adult and minor females.

36.     **MASSEY** reported numerous accounts and/or messages to Facebook for various reasons. He made seven reports, specifically for nudity or sexual activity, which is strange given the fact that **MASSEY** was the initiator of sexual activity for the majority of interactions on the account. Several examples are as follows:

        a.     **MASSEY** initiated a chat with Facebook user R.C. on December 2, 2023. R.C. was unresponsive when **MASSEY** asked how she was and **MASSEY** repeatedly attempted to call her. **MASSEY** told her several times how beautiful and adorable she was, presumably in response to pictures of herself in a group chat. **MASSEY** asked her, "R u a top or bottom girl." R.C. told him in no uncertain terms to leave her alone, but **MASSEY** ignored it. He asked, "Do u have any videos," and "Do u spit or swallow," and asked to

see a video of her giving her boyfriend oral sex. R.C. made it clear that she was uncomfortable and was only 14 years old, but **MASSEY** continued, "Have u ever sent nudes," and "Do u prefer ur stomach?" and "Let's see how u suck dick." When R.C. asked for **MASSEY**'s age, he claimed to be 16 years old.

       b.    A chat with Facebook user "E.F." was reported by **MASSEY**. Only a partial interaction was available in the records returned. The known chat messages began on March 7, 2025. **MASSEY** asked E.F., "What hole or holes could I put my d in," and "How big r ur boobs." **MASSEY** said, "Since u have seen my d can I see something in return," and "Could I please see a shirtless pic of u." E.F. sent a picture of a nude minor female, covering her breasts and genital area. To this picture **MASSEY** commented, "Mmm" and "Sexy." E.F. asked if **MASSEY** was a virgin, suggesting he was portraying himself as a minor.

       c.    A chat with Facebook user "P.W." was reported by **MASSEY**. Only a partial interaction was available in the records returned. The known chat messages began on March 22, 2025. P.W. told **MASSEY**, "Well I think I have shown u enough…what have you got to show me?" This suggests she had already sent **MASSEY** pictures of herself. **MASSEY** responded, "I wanna see u fucking that pussy." P.W. sent several videos of her vagina. **MASSEY** encouraged her, saying, "Spread it open." Some messages appear to be missing, but, from the context, it appears **MASSEY** likely told P.W. he wanted to see her having oral sex with other men. P.W. said, "I am not sucking someone who is double my age," and "Even triple." In a group chat, P.W. claimed to be 14 years old, which is consistent with the pictures of herself she sent to **MASSEY**.

37.     There was no interaction between **MASSEY** and K.K. documented on **MASSEY**'s Facebook account. Additionally, although **MASSEY** was listed as being a member of the "Christian teens [cross emoji]" Facebook group, there were no messages associated with that group in the records returned.

38.     On July 31, 2025, a Search Warrant was signed in the Western District of Oklahoma which authorized the search of the person of Brandon Scott **MASSEY** for contraband and evidence, fruits, and instrumentalities of violations of the offenses under investigation, including computers. The Search Warrant was executed on August 7, 2025 in Lawton, Oklahoma. At the time of the warrant execution, **MASSEY** was approached by law enforcement officers while talking on an iPhone (the **SUBJECT CELLPHONE**). The **SUBJECT CELLPHONE** was the only item seized pursuant to that Search Warrant.

39.     Immediately following the execution of the Search Warrant, **MASSEY** was provided the option to speak to agents regarding the investigation of the offenses specified herein. **MASSEY** was read his *Miranda* rights, confirmed he understood, and agreed to speak to the interviewing agents.

40.     During the interview, **MASSEY** admitted to previously being a member of multiple Facebook groups intended for minors, including one called "Christian Teens," of which he may have been a member as recently as the previous week. He also admitted to utilizing the Facebook platform to interact with minor girls with the intention of obtaining sexually explicit pictures of their breasts and genitals. **MASSEY** advised that the pictures he obtained from minor females were saved on the **SUBJECT CELLPHONE**, for which he provided the passcode.

41.     During the interview, **MASSEY** also recalled being a member of the Facebook group "Russian – Ukrainian war videos," in which members posted "brutal" videos, such as people

being murdered. **MASSEY** was shown a partial screenshot of the child pornography video described herein that was posted by **MASSEY**'s account. **MASSEY** recognized the screenshot as originating from a video that was posted to the Facebook group but did not recall whether he ever re-posted it. **MASSEY** advised that he saved the video to his old iPhone, and then later deleted it. But when his old iPhone crashed, he used iCloud to transfer files to the **SUBJECT CELLPHONE**, and the child pornography video was included in the transferred files.

42. Following the interview, **MASSEY** agreed to take a polygraph examination in order to corroborate his statements. Prior to the actual polygraph test, **MASSEY** created a written statement in which he admitted to utilizing Facebook Messenger to contact approximately 20 minor females to request images and videos of their genitals, breasts, and buttocks. **MASSEY** advised that he received approximately seven or eight videos wherein the minor girls were masturbating at his request. **MASSEY** wrote that his current phone (the **SUBJECT CELLPHONE**) was an iPhone 12, which he began using in early 2025 after his old phone crashed. **MASSEY** identified his old phone and the **SUBJECT CELLPHONE** as the only electronic devices he has used to request and receive child pornography.

## BACKGROUND ON DIGITAL MEDIA STORAGE DEVICES AND CHILD PORNOGRAPHY

43. The ability of a computer (including a smartphone) to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in personal computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. Given the storage capabilities, modern computers can retain many years' worth of a user's data, stored indefinitely. Even deleted data can often be forensically recovered. Other

digital media storage devices (e.g., compact discs, digital video discs, thumb drives, etc.) can also store tremendous amounts of digital information, including digital video and picture files.

44.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or Internet Service Provider client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.  Further, even if deleted, the forensic examination can sometimes recover files and data, including deleted picture files.  Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.  I know that computers such as laptops and iPhones and other smartphones can be forensically examined, and forensic analysts can learn much detail about the user's habits and online activities, including websites visited, files downloaded, Google searches performed, locations where the device was used, dominion and control information, etc.

45.    Computers and other digital file storage devices can store the equivalent of thousands of pages of digital information.  Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names.  This requires the searching authorities to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take days or weeks depending on the volume of the data stored, and it would be generally impossible to accomplish this kind of data search on site.  Furthermore,

I know that smartphones (a type of "computer," as broadly defined in 18 U.S.C. § 1030(e)(1)), like an iPhone, can typically "synch" with a traditional desktop or laptop computer. The purpose of synching a smartphone to a traditional computer is to back up data that is stored on the phone so that it is not permanently lost if the portable smartphone is lost or damaged. Also, smartphone users may move files off the smartphone and onto a computer to free up storage space on the smartphone. Similarly, computer (e.g., desktop computer, smartphones, etc.) users may move files off of one computer onto another computer or digital file storage device such as a thumb drive, a DVD, or an external hard drive to free up space on the computer.

## SEARCHING COMPUTERS

46.    Searching computers, including smart phones, for criminal evidence is a highly technical process requiring skill and a properly controlled environment. The search fo a computer or computer system is an exacting scientific procedure designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password-protedcted, or encrypted files. Since computer evidence is vulnerable to tampering or destruction, the controlled atmosphere of a laboratory is essential to complete this task. The FBI, Oklahoma City Division has such a laboratory staffed with certified computer forensic examiners. An extraction of the original storage media will be produced by the assigned forensic examiner and then uploaded to a secure review network for Case Agent review, so as to maintain the integrity of the original evidence.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

47.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

48.    I assert there is probable cause to believe that things that were once stored on the **SUBJECT CELLPHONE** may still be stored there, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

49.    *Forensic evidence*. As further described in **Attachment B**, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the **SUBJECT CELLPHONE** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **SUBJECT CELLPHONE** because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file

(such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

  b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how an electronic device was used, the purpose of its use, who used it, and when.

  d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

50.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **SUBJECT CELLPHONE** consistent with the warrant. The examination may require authorities to employ

techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **SUBJECT CELLPHONE** to human inspection in order to determine whether it is evidence described by the warrant.

51.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for this Court to authorize the execution of the warrant at any time in the day or night.

## AUTHORIZATION REQUEST

52.    Based on the above information, there is probable cause to believe that the foregoing laws have been violated, and that the following property, evidence, fruits, and instrumentalities of these offenses are located on the **SUBJECT CELLPHONE.**

53.    Based upon the foregoing, I respectfully request that this Court issue a search warrant for the **SUBJECT CELLPHONE,** described in **Attachment A,** authorizing the seizure of the items described in **Attachment B** to this Affidavit.

Respectfully submitted,

Shana M. Terry
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on August 14, 2025.

AMANDA L. MAXFIELD
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### DESCRIPTION OF THE PROPERTY TO BE SEARCHED

One black Apple iPhone maintained at the FBI Oklahoma City Field Office, Evidence Control Room, as item 1B5, bearing barcode E8487556, which was seized from Brandon MASSEY's person on August 7, 2025 pursuant to a Search Warrant. Photographs of the front and back of the **SUBJECT CELLPHONE** are pictured below.



**ATTACHMENT B**
**LIST OF ITEMS TO BE SEIZED**

1.    Computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

2.    Notes, documents, records, or correspondence, in any format and medium (including, but not limited to, e-mail messages, chat logs, and other electronic messages) pertaining to the coercion and enticement of a minor.

3.    In any format and medium, all originals, computer files, and copies of child pornography as defined in 18 U.S.C. § 2256(8), and visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.    Notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs, or other electronic messages), identifying persons transmitting, through interstate or foreign commerce by any means, any child pornography as defined in 18 U.S.C. § 2256(8), or any visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

5.    Notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs, or other electronic messages, other digital data files, or web cache information) concerning the receipt, transmission, manufacture, or possession of child pornography as defined in 18 U.S.C. § 2256(8), or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), or communication with minors.

6.    Notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs, other electronic messages, and other

digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

7.      Any notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

8.      Any records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

9.      Any visual depictions of minors engaging in sexually explicit conduct.

10.      Contact lists, mailing lists, supplier lists, and any documents and records, in any format or medium (including, but not limited to, e-mail messages, chat logs, other electronic messages, and other digital data files), pertaining to the preparation, purchase, or acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, any child pornography as defined in 18 U.S.C. § 2256(8), or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

11.     Any notes or other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, instrumentalities, contraband, and/or fruits described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.